The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any matter or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. We'll proceed with the first case, United States v. Williams. And I guess, Mr. Smith, you're up. Yes, Your Honor. Thank you. And good morning to everyone. You have Nick Smith for all four appellants. They've all pled guilty to conspiracy to distribute 500 plus grams of methamphetamine without plea agreements. They all have pretty sad stories of addiction ruining their lives. Johnson, Williams and Bennett fell into the trade this way, not to prey on weak people. The Virginia piece of this conspiracy involves Johnson, Williams and Bennett. They're not involved in the entry points out west. And I think we would concede, Your Honor, that Appellant Ferris is somewhat differently situated in that respect. The 27 defendant conspiracy doesn't specify between ice, higher purity methamphetamine and lower purities. And in the guidelines, the Court knows that ice is the strongest currency in the table, so to speak. So one unit of ice gets you 10 units of a lower meth mixture. And it's not just, you know, the comparison between ice and lower meth mixtures. One unit of ice gets you two units of heroin. So the commission's logic was that higher purities are found upstream with the kingpins. But courts around the country, subsequent to when the commission last met, have sort of have declined to apply that ice bump on policy grounds because it's now thought that ice has monopolized the market. And so it's not as reasonable to infer that higher purities of meth imply a kingpin type of role. So there were two sentencing questions for all of the appellants. One is drug quantity and type attribution. And the other was the defendants asked the court to dilute, so to speak, the 10 to 1 ice regular meth ratio on policy grounds. All of the appellants were hit with 1.5 to 4.5 kilos of ice. So the judge declined to disagree with the 10 to 1 ice disparity and attributed the entire bulk of the conspiracies ice, the 27 defendant conspiracies ice, to each appellant. So, Your Honors, we can see that the district court cited the correct standard for attribution under the guidelines. That's rule 1B1.3. It's the Pinkerton standard. But our argument is between the motion and the act falls the shadow. There is a Collins case in this circuit that says the Pinkerton's analysis for drug attribution has to be individualized. And if you look at what we think what the court did instead of what the standard was, the court's focus was on, quote, the conspiracy itself was centered on ice. And defendants knew or reasonably should have known that fact, end quote. That's Joint Appendix 177. But if you go through the parts of the analysis the court followed, it was more conspiracy focused than individualized. So the first point we'd like to make is that there was testimony from a DEA task force officer named Park in all the cases where he testified that you can't, quote, eyeball the distinction between ice and lower purity meth. So that, if you could, that might have been a basis for the court to find that the appellants here had actual knowledge of what they were selling being ice, even though there were no lab tests performed on most of the appellants showing that what they possessed was ice. But that wasn't the case. So what did the court focus on? Well, it focused on kind of general. Well, counsel, the judge, and I'm looking at the opinion from the district court, he went through defendant by defendant and talked about their involvement and the folks that they bought and sold from, most of whom pled guilty and said this was an ice meth conspiracy and that's what their transactions were about. Why isn't that enough? Thank you, Your Honor. So I was getting there, but it was taking me too long. So our response to that point is that the plea agreement stipulations do concede that those defendants in the larger conspiracy conceded they were dealing in ice. And the district court was correct to note that some of those individuals had interactions with the appellants in this case. But what the court did not link between those two groups was references to ice. So I think if the debate were about whether— So if you look at the cases that the government cites on this exact point, actual knowledge or reasonable foreseeability, there's one of two factors. One is a lab test showing ice purity taken from the actual defendant, showing that the drugs that he was selling were ice.  that the drugs were ice, or a witness testifies that I said to him this was ice. He was in a conversation where he was acknowledging this is ice. Those are the kinds of factors that the courts have relied on that Mr. Juhan has cited. Both of those are absent here. You don't have anyone testifying that these defendants said they acknowledged this was ice. You don't have any lab tests showing that what they were dealing with ice. On the contrary, Judge, one of the tests taken from one of the appellants here shows it wasn't ice, that he was dealing in drugs that was half the percentage of ice. But counsel, in addition to the stipulations of the individuals with whom your clients were dealing, Mr. Park testified in a way that I think links test results showing ice level purity to all of the defendants with the exception of Johnson. Now, I realize in Bennett, there was one that was less than 80%, but the others have testimony linking them to lab results that are at the ice level of purity. You know, why wouldn't that justify the sentence? Judge, we think that's right. I think we would concede that on the point where there's plenty of precedent for the principle that if a certain quantity of drugs is associated with a particular defendant, and it's only, let's say, only a fraction of it is ice, the court can appropriately extrapolate from that portion of what was seized from that defendant to a larger amount. I think your Honor's correct. That's true for Appellant Williams, where the quantity tested that was seized from him was 100% pure. But your Honor, we would just object that. We do not think that's true for Johnson or Bennett. For Johnson or Bennett. And I think that's where, when they tested... Well, look, if I could interrupt you. I know I'm familiar with the test that shows the less than 80%. And I'll go back and double check. But I thought that the lab reports at 310, you know, the testimony or the record indicated that those were linked to him as well. I may be wrong. I'll double check that myself. But that was my memory. And that's what my notes from going over this said. That's correct, Your Honor. So I think our response to that in the reply brief was that the government essentially used the same lab test for all four appellants. And the court, the connection between those lab test defendants and these appellants was some conversations and some interactions they might have had with each other. But there was no evidence that those conversations had anything to do with the distinction impurities. So we're not clear on what the argument is, the inference argument here is. Can we extrapolate from any kind of conversation between Mr. A and B that the subject matter is about purity? I think we would say that that's not strong enough to develop that inference. And we don't think that those cases support that inference, Your Honor. So if you cut out the stipulations in the co-conspirators plea agreements, you're not left with much individualization here. The other kinds of logical underpinnings for it know their product, and I don't think there's much support for that in the case law. The other large piece of this was, well, meth has monopolized the market. So how can you claim you're not aware of what this drug is if it's monopolized the market? Well, Your Honor, if there's only one thing in the market now, then we don't need to focus on what the properties of what that product are. It's just meth. That's all that exists anymore. So the claim that you should know how pure this drug is, you should know how dangerous this is, that might have made sense when the market contained multiple products and we've got to choose between one versus next on an economic basis. This one's cheaper. You get more for your fang for your buck with this one. That logic doesn't apply anymore, Your Honor. And so we think that this didn't satisfy the Collins case of individualization. And we think that if this were just an academic exercise to send this back to the district court, well, then why didn't the government offer testimony from token speakers saying, hey, I had a conversation with Appellate Johnson. He said, this is us. We had a conversation. We were talking about methadone. That didn't happen and it could have. And there's a reason it didn't happen. So the other argument was about the district court's decision not to vary on policy grounds. We can see that this is a matter wholly within the discretion of the district court and it's generally not reviewable on appeal. Our point is that there is a narrow opening where if the court decides to go out on a limb and address policy, it doesn't have to. But if it does, this court can review a factual premise against discretionary decision making if it's incorrect. There's no rule that says this court has to allow an incorrect premise to stand. And we think that if the court proceeds through the premises that the district court had to justify the 10 to 1 disparity, they don't really hold up. It is true that meth is a dangerous drug. Absolutely the case. But that wouldn't explain why there's a 10 to 1 disparity between ice and meth. There were some erroneous web page of meth facts that the court cited from a web page but were not appropriately sourced. And we think if you look at the government's brief, it's not actually defending those premises. The final arguments is that Appellant Johnson was scored a criminal history category 2 because the meth conspiracy, which ran from January 2016, October 2018, overlapped by 30 days with a DUI probationary period. Mr. Johnson argued that's exactly the kind of reason that a district court might depart downward under 4A1.3. Um, the district court didn't address the argument. We don't think it was deliberate. There were lots of issues the court was addressing at the time. And the argument is that under the blue case, I don't understand why criminal history is less simply because the overlap is 30 days. I mean, what if the overlap was 100 days? So what if the overlap was one day? He still had that criminal history. You have to draw a line as to which prior offenses you're going to consider. But he did commit the prior crimes, and he was on probation during the time of the offense. And so the fact that the overlap was only 30 days doesn't diminish the criminal history. Your Honor, that's a very reasonable analysis of the issue. And if the court had proceeded through that analysis, I think we would have, the government's correct, we would have no basis to challenge it on appeal. I think that the argument is more procedural, which is the court could have gone through that analysis and decided that way. But conversely, it could also have found that this is, the standard is whether it's the type of facts that might suggest that the criminal history category overstates the seriousness of the category. I mean, your argument's about not disagreeing with the policy and not imposing a benefit on the criminal history. These are, this isn't a case where he has to justify giving a higher sentence. He's following the guidelines. You're challenging his decision, the judge's decision, simply based on what he thinks the guidelines impose. And these divergences from the guidelines are virtually unreviewable, it seems to me. They're judgment calls that are being made by the district judge. In both cases, he followed, in the first instance, he followed the policy. And whether he agreed or disagreed or was misinformed, the policy is the policy established by the commission. And with respect to the reduction of criminal history, he followed the guidelines again. And you're suggesting that he should have done something more beneficial. And I don't understand it, how we challenge these negative discretionary decisions. Your Honor, I just want to make clear, I just want to make clear that on the criminal history category argument, we are not challenging the substance of anything the district court judge did. We are only challenging that it slipped between the cracks. And we don't think this was deliberate on any vitamins. On the contrary, we think it wasn't considered because there were lots of other issues. And we think that's the type of issue that Blue says warrants a remand, just to make sure that the argument was properly considered, Your Honor. And so if there aren't any other questions, we'll... All right. Thank you, Mr. Smith. Mr. Juhan. Yes. Cagle Juhan on behalf of the United States. And if I may, I'd like to start first by addressing some of Judge Agee's questions and then addressing some of the conversations Judge Qualibon began. Judge Agee, you asked about why isn't this evidence sufficient? And Mr. Smith's response was to essentially say, well, this record doesn't have direct evidence of knowledge. But of course, direct evidence of knowledge is not required. This is a circumstantial evidence case and it's a very strong circumstantial evidence case. Additionally, I would cite to the court, this court's recent opinion authored by Judge Agee in City Court, it's a published opinion in an ICE methamphetamine conspiracy case where the court said, what we're looking at is the evidence that is in the record. We're not talking about doing what other evidence there could be. So sure, Mr. Smith is correct. Theoretically, there could be better evidence in this case. But what we're stuck with is the record in this case, which shows that these defendants were major players in this conspiracy, that their direct co-conspirators admitted the conspiracy was about ICE, that what was seized from the conspiracy was in fact ICE, and the market that these guys were in the business, in the livelihood of supplying, preferred ICE methamphetamine. And so those are all bricks in the wall that the district court could use to find by preponderance that these defendants each individually knew or at least thought to have foreseen that this conspiracy involved ICE. Now, to Judge Qualibam, your question, you ask about what about, I think, JA-310. JA-310 are the lab certificates of the ICE that was sent from Mr. Ferris to Ms. Barrett. Now, Ms. Barrett initially was the direct supplier in this conspiracy for Mr. Williams. Mr. Williams got several ounces at a time for her, and she eventually said, I don't want to keep distributing to you. I don't want to do that volume. And so the evidence is uncontested that Mr. Williams then went straight to the source out in Southern California and right to Mr. Ferris to get more methamphetamine. And so that intimate, significant involvement. Yes, Your Honor, you have a question? I'm sorry. Well, I did. Was it significant? I'm sorry, counsel, and maybe you're getting to this, but I'm just trying to see if I've noted this right. I'm having a little trouble getting my hands on it now. Did that lab report at JA310, was it connected with Defendant Bennett at all? I do not believe, Your Honor, that it was connected with Defendant Bennett. I think, I don't think it was, Your Honor. I would not go to that. That's not my recollection of the record. So with respect to Defendant Bennett, are there any lab results that were connected to him? I know you have the stipulation and the testimony about everyone's involvement, but are there any lab results specifically connected with Mr. Bennett? Or I don't know if it's with... It's Mr., it's Mr., Your Honor. Yeah. No, I don't believe, my recollection is that there is not a seizure in this specific case that was lab tested and came directly from Mr. Bennett that came back as eyes. Now there, of course, was the small quantity that was from him that was not eyes, and the district court considered that fact. It weighed that fact. And this court's opinion from 2000, it's unpublished, but from 2000 in Cockrell says, well, that's okay. The district court can do that even if there's some non-eye seizure. And as to Mr. Bennett's significant involvement, he was getting 13 pounds methamphetamine directly from an interstate source fronted to him by Ms. Roberson, who, again, agreed as part of her plea agreement that this conspiracy involved eyes. And she was getting that, in fact, from Mr. Ferris herself. And so there certainly is substantial, circumstantial evidence that someone in his position, as involved as he was, ought to have known that this conspiracy was about eyes. And I'll also point out, Your Honor, JA 102 to 04, the district court had a colloquy with Mr. Bennett's counsel about that and said, you know, I think I understand this argument that maybe you'd have something to stand on if he was just some mule, but he was deeply involved in this conspiracy. And so when you add all the facts together, Your Honor, there's certainly a, it wasn't clearly erroneous for the district court to conclude what it did. I'd be happy to answer any other questions the court may have about any of the issues in the case. All right, thank you, Mr. Juhann. Mr. Smith? Thank you. Yeah, yes, Your Honor. So Mr. Juhann just referenced, just made an argument that we can infer knowledge of eyes versus lower quantity methamphetamine from the sheer bulk of the drug that some of the appellants had received. And I think our response to that is that if the question were whether the appellants knew that the drug was methamphetamine versus some other kind of drug, that is absolutely correct. The inference there is rock solid. But since the question is not whether the drug was methamphetamine, but whether there was knowledge of ice, which is a specific kind of purity that's punished much more ferociously than other kinds, I don't think bulk itself is a factor that allows you to infer purity from.  any other kind of factor that would allow the court to infer purity for the defendants from whom no seizures were made of ice, no testimony was given that the defendants mentioned selling ice or were in conversations about ice. And I don't think there's any other factor here that gets you there, Judge. So I think that's where we'll stand with our argument. All right. Thank you for your arguments. Mr. Smith, do I understand you were court appointed? Yes, that's right. I want to thank you, genuinely thank you for your service. That was a very sophisticated argument and I think your clients can be happy with that. We normally come down at this point and shake hands with counsel and we'd love to do that. But the best we can do is extend our greetings and thank you for your arguments today. We'll take the case under advisement and proceed to the next case. Thank you very much, Judge. Thank you, Your Honor.
judges: Paul V. Niemeyer, G. Steven Agee, A. Marvin Quattlebaum Jr.